**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 22-1690**

---

SAS ASSOCIATES 1, LLC; MILITARY 1121, LLC,

        Plaintiffs – Appellants,

v.

CITY COUNCIL FOR THE CITY OF CHESAPEAKE, VIRGINIA,

        Defendant - Appellee.

---

Appeal from the United States District Court for the Eastern District of Virginia, at Norfolk. Raymond A. Jackson, Senior District Judge. (2:21−cv−00491−RAJ−DEM)

---

Argued:  December 6, 2023                  Decided:  January 24, 2024

---

Before WILKINSON, NIEMEYER, and AGEE, Circuit Judges.

---

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Niemeyer and Judge Agee joined.

---

**ARGUED:**  Robert W. McFarland, MCGUIREWOODS, LLP, Norfolk, Virginia, for Appellants. Ellen Frances Bergren, OFFICE OF THE CITY ATTORNEY, Chesapeake, Virginia, for Appellee. **ON BRIEF:**  V. Kathleen Dougherty, Norfolk, Virginia, Sean A. McClelland, MCGUIREWOODS LLP, Washington, D.C., for Appellants. Jacob P. Stroman IV, City Attorney, Daniel J. Wisniewski, Assistant City Attorney, OFFICE OF THE CITY ATTORNEY, Chesapeake, Virginia, for Appellee.

---

WILKINSON, Circuit Judge:

SAS Associates 1, LLC and Military 1121, LLC (collectively "the Developers") appeal the district court's order dismissing their claim against the City Council of the City of Chesapeake, Virginia ("the City Council") pursuant to Federal Rule of Civil Procedure 12(b)(6). The Developers alleged that the City Council violated their equal protection rights when it denied their rezoning applications. But the Developers' own complaint belied their claims by providing multiple sound bases for the denial. We thus affirm.

I.

A.

The Developers own several parcels of land in Chesapeake, Virginia. They wanted to combine those parcels to create a ninety-acre development that would include single- and multifamily housing units, commercial space, and a sixty-acre conservation district.

But there was a hitch in the plan. The area slated for development lay within several zones—agricultural (A-1), general business (B-4), and single-family residential (R-15S)—that each placed restrictions on land use. Those restrictions did not allow for the types of uses the Developers envisioned.

The Developers thus sought to have their parcels rezoned. They filed their first rezoning application in June 2016, asking that their land be rezoned for multifamily residential (R-MF1), neighborhood business (B-1), and conservation (C-1) uses. The application articulated a development plan that included 293 townhouse-style condominiums and 10,000 square feet of commercial space.

2

In Chesapeake, such rezoning applications are first reviewed by the city's planning commission, which assesses the application, holds an initial public hearing, and recommends a course of action to the City Council. After its hearing, the planning commission recommended that the City Council approve the Developers' 2016 application. It found that the proposal satisfied Chesapeake's Planning and Land Use Policy, which set level-of-service standards meant to ensure that a development would not overwhelm local infrastructure. The planning commission also found that the proposal was consistent with Chesapeake's comprehensive plan for the area and compatible with the development of the surrounding community.

The City Council's own public hearing on the Developers' application was less promising. Residents from the surrounding neighborhoods spoke out against the proposed development, and the City Council ultimately denied the application, citing community opposition and observing that existing zoning classifications did not preclude useful development.

The Developers revised their proposal and refiled in 2018. The revised proposal reduced the residential density of the project by nearly fifty percent, outlining plans for 153 single-family and townhouse units. It also included 11,300 square feet of commercial space and a sixty-acre conservation district. The planning commission again found that the Developers' application was consistent with Chesapeake's comprehensive plan, its level-of-service standards, and the development of the surrounding community.

The City Council held a public hearing on the Developers' revised application in early 2020. Residents from nearby neighborhoods once again spoke against the proposed

3

development. They expressed concern about recent flooding and worried that the development would compound the area's drainage problems. They also complained that the inhabitants of the new dwellings would exacerbate existing traffic congestion.

After hearing from the concerned neighbors, Councilmember Debbie Ritter moved to deny the application. The land at issue, she said, could be developed under its present zoning classifications. In her view, given recent infrastructure issues in the area, it was not the right time to relax zoning restrictions and greenlight a new development. She also criticized the city's level-of-service standards as outdated and inadequate. The fact that the development met those outdated standards did not assuage her concerns that it would have a detrimental effect on the infrastructure in the area. Specifically, she worried that the development would compound flood risk and increase enrollment at already overpopulated schools. She also expressed concern about traffic issues resulting from the "1500 vehicle[] trips a day" projected to be generated by the Developers' project. J.A. 21. Councilmember Ritter summed up her position by stating, "So for all those reasons I think that sort of memorializes my feeling on the application and why, unfortunately . . . this isn't the right time." *Id.*

In response, Chesapeake's Floodplain Administrator, James Tate, was asked to address the drainage concerns. Mr. Tate acknowledged that the surrounding area suffered from regular flooding due to the elevation of previously developed land, but averred that the Developers' project could be designed so that it would not have a detrimental effect.

Notwithstanding Mr. Tate's assessment, the City Council ultimately voted 7-2 to deny the Developers' application.

4

B.

Following the denial of their second application, the Developers filed a complaint in the United States District Court for the Eastern District of Virginia, alleging that the City Council's denial violated their right to equal protection of the laws under the Fourteenth Amendment and 42 U.S.C. § 1983, as well as their rights against unconstitutional rezoning limitations under Virginia state law.

The Developers argued that the City Council had violated their right to equal protection by denying their application even though it had approved similar applications from other developers. In support, the Developers' complaint identified ten "similarly situated" developments that had been permitted to go forward. The Developers also argued that the City Council's reasons for denying their applications were irrational and arbitrary in light of the record before it, and that therefore the denial was only logically explained by discriminatory animus.

The City Council moved to dismiss the Developers' action pursuant to Rule 12(b)(6). The district court granted the motion, finding that the Developers had failed to state a claim upon which relief could be granted because the ten identified developments were not similarly situated and because the Developers had not sufficiently alleged any purposeful discrimination by the City Council. The district court also dismissed the pendent state-law claim for lack of independent jurisdiction. This appeal followed.

II.

On appeal, the Developers contend that the district court erred in dismissing their claim under Rule 12(b)(6), a matter we review de novo. *Woods v. City of Greensboro*, 855

5

F.3d 639, 646 (4th Cir. 2017). They posit that their complaint plausibly alleged that similarly situated developments were approved while theirs was denied. They also contend that they adequately refuted the City Council's stated rationales for treating their development differently. Under *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000) (per curiam), they argue, those allegations sufficed to make out a class-of-one equal protection claim plausible enough to withstand a Rule 12(b)(6) challenge.

As a prefatory matter, we underscore that zoning decisions are presumptively the province of local governments. Land use decisions like these lie at the core of local governments' historic responsibilities in much the same way that state governments regulate domestic relations and the federal government oversees matters of national security. *See Gardner v. City of Baltimore Mayor & City Council*, 969 F.2d 63, 67 (4th Cir. 1992).

To have the federal courts upending zoning decisions impairs the constitutional architecture in two ways. First, zoning challenges constitute a request for the federal government to intervene in local affairs. Zoning decisions primarily impact the communities to which they apply. Local officials are well equipped to make such decisions because they interact with those most affected and can remain attentive to their changing needs. Their constituents attend the schools, drive the roads, and drink the water that zoning classifications affect. The federal government, on the other hand, waves a distant wand. It cannot inform itself about individual communities well enough to know their needs and is thus comparatively ill-suited to decide matters of zoning.

Second, appeals of zoning disputes such as this one are requests for judicial authority to displace discretionary legislative judgments. Zoning decisions generally turn on questions of public policy about how to organize a community: What types of properties should be slated for which areas? What is the optimal population density for which location? Such judgments are best left to elected bodies, which are both representative and accountable. Federal courts are relatively beyond the reach of the displeased; democracy by contrast does not disenfranchise the discontented.

We see no reason to override the City of Chesapeake's judgment here. To make out an equal protection claim, the Developers must "plead sufficient facts to demonstrate plausibly that [they] w[ere] treated differently from others who were similarly situated and that the unequal treatment was the result of discriminatory animus." *Equity In Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 108 (4th Cir. 2011). Here, just like in *Equity In Athletics*, the Developers "failed to make sufficient allegations with respect to either element." *Id.*

A.

As an initial matter, the Developers have supplied no facts from which we could infer discriminatory animus on the part of the members of the City Council. Discriminatory animus cannot be established simply by showing "that a benefit was denied to one person while conferred on another." *Sylvia Dev. Corp. v. Calvert County, Md.*, 48 F.3d 810, 819 (4th Cir. 1995). Rather, there must be some evidence that the disparate treatment was intentionally selected to produce "adverse effects upon an identifiable group" or individual. *Wayte v. United States*, 470 U.S. 598, 610 (1985) (quoting *Pers. Adm'r of Mass. v. Feeney*,

7

442 U.S. 256, 279 (1979)). Such evidence can come in various forms. For example, a complainant might provide facts that establish the decisionmaker harbored ill will toward her or a class of which she was a member; she might provide evidence of a pattern of historical discrimination intended to disadvantage a particular person or class; or she might point to statements in the contemporaneous record that evince a discriminatory purpose. *See Sylvia Dev. Corp.*, 48 F.3d at 819.

In this case, the Developers attempt to allege discriminatory intent by taking aim at Councilmember Ritter, who voiced an opinion on traffic congestion and drainage concerns and school capacity. For those comments, she is alleged to have harbored discriminatory animus. But the record is devoid of anything that would lead us to conclude that the concerns she expressed were pretexts for discriminatory animus or that there was an issue of triable fact as to the same. Councilmember Ritter was discussing precisely the kinds of things that local governments routinely discuss in considering matters of zoning. To say that a councilmember cannot opine on congestion in the schools and on the streets and increased burdens on the drainage and sewage systems without being accused of discriminatory animus would be to cripple her ability to represent her constituents. The factors Councilmember Ritter considered here are the very ones that ought to be taken into account when making zoning determinations.

Moreover, Councilmember Ritter's concerns echoed those of the community. The Developers argue that those concerns were unfounded, but that is a dispute best umpired by the City Council, not by a federal court. It is the City Council's "responsibility to mediate disputes between developers[] and local residents." *Sunrise Corp. of Myrtle Beach*

8

*v. City of Myrtle Beach*, 420 F.3d 322, 329 (4th Cir. 2005). And given the facts before them, the councilmembers "reasonably could have believed" that the denial was "rationally related" to the "legitimate government interest" of mitigating flooding, traffic, and school overcrowding in the region. *Front Royal & Warren Cnty. Indus. Park Corp. v. Town of Front Royal, Va.*, 135 F.3d 275, 290 (4th Cir. 1998). Whether they were right or wrong on that judgment is a matter for the next election.

B.

The Developers' case is further weakened by their inability to supply any comparator property that would support their view. Not one of the properties they identify in the complaint is sufficiently similar to theirs to support an inference of zoning malfeasance.

In *Olech*, on which the Developers rely, the Supreme Court confronted a town which had departed from a clear, objective standard that had been uniformly applied to other property owners. 528 U.S. at 565. The plaintiffs in that case had asked to be connected to the town's water supply. *Id.* at 563. The town demanded that they cede it a thirty-three-foot easement, even though the town required only fifteen-foot easements for water connections from other property owners. *Id.* The plaintiffs refused. *Id.* After much delay, the town relented and connected their water service with a fifteen-foot easement. *Id.* The Court held that those facts made out a sufficient case that the town had "intentionally" treated the plaintiffs differently than "other similarly situated property owners," and that the departure was irrational and wholly arbitrary. *Id.* at 565. That, the Court held, was enough to plausibly allege an equal protection violation. *Id.*

9

In contrast, discretionary zoning decisions such as the one here are generally not governed by "a clear standard against which departures, even for a single plaintiff, c[an] be readily assessed." *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 602 (2008) (discussing *Olech*). To establish a class-of-one claim, a person complaining of a zoning decision must therefore "show an extremely high degree of similarity between themselves and the persons to whom they compare themselves." *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006). Only then can we infer that the decisionmaker's differential treatment was intentional and arbitrary.

The Developers, in their own pleadings, demonstrated that there was not an "extremely high degree of similarity" between themselves and the ten other developments to which they purported to be substantially similar. Nine of the ten developments were constructed between 1960 and 2009. In the interval between 2010 and the City Council's 2020 decision, obvious demographic changes had occurred in Chesapeake, as an influx of more than twenty-five thousand new residents came into the city. *QuickFacts: Chesapeake City, Virginia*, U.S. Census Bureau (last visited Jan. 4, 2024). Comparators lose their force through the passage of time. As a city becomes more densely populated, zoning authorities should not be required to approve any development that resembles one approved when the city was less crowded.

The only proposed comparator approved in the same time frame as the Developers' proposal was Knell's Ridge. But it is located 1.3 miles away on a different road, in a different part of the city. Where zoning is concerned, short distances can sometimes require different outcomes. It is not at all unlikely that one proposed site sits near a crowded school

10

while another does not. Or that one proposed location lies at an intersection free of traffic jams and another sits at a congested or even dangerous traffic thoroughfare.

Moreover, none of the comparator developments were alleged to include a commercial component, while the Developers here proposed 11,300 square feet of commercial space. And none of them had requested the Developers' proposed combination of R-MF1, B-1, and C-1 zoning classifications. "[I]n the land-use context, to be prima facie similar, the comparators must be engaged in the same type of land use." *Clubside*, 468 F.3d at 159 (discussing the holding of *Campbell v. Rainbow County, Ala.*, 434 F.3d 1306 (11th Cir. 2006)); *see also Tri Cnty. Paving, Inc. v. Ashe County*, 281 F.3d 430, 440 (4th Cir. 2002) (holding that an asphalt plant was not similarly situated to other businesses that did not pose similar environmental and safety concerns).

These dissimilarities, as the district court recognized, are fatal. It is fundamental to equal protection law that those differently situated may be treated differently.

## C.

The Developers note that their case was resolved on a motion to dismiss pursuant to Rule 12(b)(6). They contend that their claim should proceed at least to summary judgment, if not to trial.[*] They claim that at the core of their case is an evidentiary matter governed by the sequential steps in the federal rules.

---

[*] The Developers alternatively ask that we remand the case with instructions that the district court should grant leave to amend the complaint. We decline to do so. The Developers never asked for leave to amend below and given the infirmities in their complaint any amendment would have been futile. *See Save Our Sound OBX, Inc. v. N.C. Dep't of Transp.*, 914 F.3d 213, 228 (4th Cir. 2019).

Not so. The Supreme Court has emphasized that conclusory statements devoid of plausibility are not enough to survive a Rule 12(b)(6) motion. A complaint must include "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The Developers' complaint does not clear that hurdle. Pleadings that simply state the elements of an equal protection claim are insufficient. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). As discussed above, the complaint here alleged no facts from which we can plausibly infer discriminatory intent. And importantly, the Developers' allegations that the zoning denial was irrational are undermined by its inclusion of Councilmember Ritter's reasons for supporting it.

The Developers claim, however, that there is an evidentiary issue as to whether the city's concerns were well founded. But that is insufficient by itself to remove the controversy from the province of local government and put it in the hands of a federal court. The Developers' disagreement with the City Council's decision does not render the Council's judgment call pretextual. The members of the City Council have been selected by the people of the area precisely because the people trust their judgment. The Developers have been given no such mandate to dictate what types of zoning classifications are reasonable or appropriate, nor have we. Whether the Developers ought to have their petition granted may be an evidentiary matter, but the evidence was properly assembled in advance of the City Council decision for consideration by the Council itself and any agencies it enlisted to assist it. Just because something is an evidentiary matter in zoning does not mean that it is subject to federal judicial resolution. Local zoning hearings may feature adversary battles the equal of any evidentiary hearing in federal court.

12

Likewise, the Developers have not alleged facts that plausibly qualify them for a class-of-one claim under *Olech*. A class-of-one claim requires a showing that highly similar comparators received better treatment. Under *Twombly* and *Iqbal*, it is not enough to simply allege such similarity; the similarity must be plausible. The Developers have provided no valid comparators and their conclusory insistence that the alleged comparator properties are similar is just the type of "naked assertion" that requires "further factual enhancement" to "nudge" a claim "across the line from conceivable to plausible," such that it passes muster under Rule 12(b)(6). *Twombly*, 550 U.S. at 557, 570.

### III.

The citizens of Chesapeake retain the right to fashion the destiny of their community subject to whatever appeals state and local zoning law provides. *See* Va. Code §§ 15.2-2308 to -2312; Chesapeake, Va., Zoning Ordinance §§ 20-300 to -303. It is their quality of life at issue, not ours. They are the ones, not us, who will feel the effects, year in and year out, of whatever decision is made. They are the ones who will be disadvantaged by overcrowded schools, who will wait in traffic lines, and who will encounter problems with flooded streets, no small matter for the many coastal communities in our nation. The record gives us no reason to take their future from them, and we affirm the judgment of the district court dismissing the complaint.

*AFFIRMED*

13