**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 18-1183**

DEXTER EDWARDS, d/b/a Edwards Land & Cattle,

Plaintiff - Appellant,

and

NICHOLAS EDWARDS, d/b/a Edwards Land & Cattle,

Plaintiff,

v.

GENEX COOPERATIVE, INC.,

Defendant - Appellee.

Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh.  Terrence W. Boyle, Chief District Judge.  (7:16-cv-00053-BO)

Argued:  March 21, 2019                           Decided:  June 13, 2019

Before WYNN, DIAZ, and THACKER, Circuit Judges.

Affirmed by unpublished per curiam opinion.

**ARGUED:**  Kennedy Lee Thompson, Eugene Cebron Thompson, III, THOMPSON & THOMPSON, P.C., Warsaw, North Carolina, for Appellant.   J. Matthew Little, TEAGUE, CAMPBELL, DENNIS & GORHAM, LLP, Raleigh, North Carolina, for

Appellee.  **ON BRIEF:**  Rebecca R. Thornton, TEAGUE, CAMPBELL, DENNIS & GORHAM, LLP, Raleigh, North Carolina, for Appellee.

———————

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Dexter Edwards ("Appellant") filed suit against Genex Cooperative, Inc. ("Genex") alleging a single claim for breach of contract. Appellant appeals the district court's (1) award of summary judgment to Genex; (2) denial of Appellant's motion for judgment on the pleadings or, in the alternative, summary judgment; and (3) denial of Appellant's motions to amend the complaint to add an additional claim for violation of the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA"). Appellant asserts that there is only an oral contract between the parties, and that the written contracts -- which Genex asserts govern the parties' relationship -- are invalid for a number of reasons.

We conclude that, regardless of whether Appellant's breach of contract claim is predicated upon a written or oral contract, the claim fails as a matter of law. Further, we conclude that the district court did not abuse its discretion in denying Appellant's request to amend his complaint, because such amendment would have been futile. Accordingly, we affirm.

I.

A.

*Factual History*

Appellant operates Edwards Land and Cattle, a business "engaged in the genetic reproduction of cattle [that] specializes in 'pure-bred genetics.'" J.A. 66.[1] Appellant's son, Nicholas Edwards ("Edwards"), manages the farm in North Carolina where the cattle are reproduced.

The genetic reproduction of cattle requires Appellant to collect "genetically elite semen from prize bulls and genetically elite embryos from prize cows. Subsequently, the semen and embryos are matched to produce 'super elite' offspring." J.A. 66–67. Appellant stores and preserves these biological products on his farm in seven metal tanks filled with liquid nitrogen.[2] The liquid nitrogen freezes these products thus allowing Appellant to "preserve elite semen and embryos from deceased sires and dams[3] and consequently, to produce 'super elite' animals." *Id.* But, because liquid nitrogen vaporizes over time, the tanks must be refilled on a regular basis so that the tanks do not

_____

[1] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

[2] Nitrogen, in its liquid state, is used to quickly freeze or store materials because of its low temperature (-320°F). Liquid nitrogen has numerous applications, such as cryogenics, molecular gastronomy, and -- as in this case -- the freezing of bovine biological products.

[3] "Sire" refers to a male bull (an uncastrated male cow) and "dam" to a female cow. *See* J.A. 383.

4

become dry. If the tanks were to become dry, the biologic products stored inside would thaw and spoil.

1.

*The Agreements*

Genex supplied Appellant with liquid nitrogen for over 15 years. During the first few years of the business relationship, the parties did business without a written agreement. But, in 2004, Genex and Edwards entered into several Liquid Nitrogen Service Agreements (the "Agreements") for the supply and delivery of liquid nitrogen for Appellant's tanks. Appellant did not review the Agreements himself but instead left the Agreements for Edwards to handle on behalf of Edwards Land and Cattle. Notably, Appellant acknowledged that, although Edwards signed the Agreements, Edwards likely did not review the Agreements before signing.

The Agreements provide that Genex would regularly provide liquid nitrogen services to Appellant. Genex refilled Appellant's tanks with liquid nitrogen approximately every 12 weeks, although Appellant could request an earlier refill if necessary. Significantly, the Agreements expressly state that the "[Appellant] accepts full and sole responsibility to . . . monitor [the liquid nitrogen] level routinely." J.A. 60. And, the Agreements also contain a clause stating that Genex "will not accept responsibility or liability for embryos or any other frozen biologic products stored in customer's tank(s) that are filled with [liquid nitrogen] by its employees." *Id.* (the "limitation of damages clause"). The Agreements were to "remain in effect unless terminated in writing by 60 days['] notice from either party." *Id.*

2.

*Monitoring of the Tanks*

In 2013, nine years after the Agreements were signed, Genex's territory sales manager and technician, Corey Peters, began placing neon green stickers on Appellant's tanks. The stickers reiterated Appellant's responsibility to monitor the liquid nitrogen levels in the tanks. Specifically, the stickers provided:

> **DISCLAIMER:** Owner/user is responsible for monitoring nitrogen level, making sure [liquid nitrogen] unit is filled regularly and kept in good working order. If tank is found to be low in [liquid nitrogen], owner/user must immediately call a[] [liquid nitrogen] provider for refill.
>
> No Genex Cooperative, Inc. Representative has authority to relieve user of this responsibility.

J.A. 407. At his deposition, in response to a question by Genex's counsel, Edwards testified that he did not attempt to read the disclaimer sticker. *See id.* at 142 ("Q: Have you ever read or tried to understand what that disclaimer said? A: No, ma'am . . . .").

Appellant's seven tanks were stored on rubber mats (to prevent damage to the tanks from the concrete floor) in Edwards's unlocked office on the farm. Appellant testified that he and Edwards monitored the tanks in three ways: first, by visually inspecting the tanks; second, by lifting the tanks to gauge the weight; and third, by inserting a black ruler (essentially, a dipstick) into the tanks to check the actual liquid nitrogen levels.

But, according to Appellant and Edwards, neither Appellant nor Edwards regularly checked the levels in the tanks outside of breeding season. Edwards testified, "when

6

we're not breeding cows I'm not monitoring [the tanks] a lot . . . it's just one of those deals that I'm not in and out of [the tanks] checking them." J.A. 139. Edwards further testified that outside of breeding season, he would "see [the tanks] everyday as far as walking through and seeing they're there; but as far as checking the nitrogen, I wasn't checking it." *Id.* at 140.

Thus, during the non-breeding season -- from June to October -- Appellant and Edwards simply visually inspected the tanks as they passed through the office. Such an inspection, however, would only allow an observer to detect signs of tank failure -- for example, a puncture in the tank leading to a loss of vacuum might result in visible condensation on the tank or on the rubber mats on which the tanks were kept.[4] Merely looking at the tanks does not indicate the actual level of liquid nitrogen in the tanks.

In contrast, during breeding season, Appellant or Edwards would actually measure the level of liquid nitrogen in the tanks with a dipstick a "couple times a month." J.A. 140. Appellant and Edwards also routinely lifted the tanks to check the weight of each tank -- an empty tank weighed approximately 30 pounds, while a full tank (freshly refilled) weighed roughly 80 pounds. If Appellant or Edwards discovered that a tank felt light, they "would stick [a] measuring tool down to see the frost line" and if the line was getting low, they would call Peters to assure that the next delivery would be occurring on

---

[4] According to Appellant's expert, Mark Wilburn, tank failure would be caused by loss of vacuum. This loss of vacuum would cause the tanks to "sweat" as the coolant (liquid nitrogen) escaped and the biologic product within defrosted. The tanks would *not* "sweat" if the liquid nitrogen simply evaporated -- rather, the liquid nitrogen would "just dissipate as normal." J.A. 411.

7

schedule. *Id.* at 333. According to Appellant, calling Peters to confirm that he would be filling the tanks soon happened "very few times." *Id.* at 334.

3.

*Tank Refill Process*

Appellant did not keep track of when the tanks were refilled. Genex's technician, Peters, did not call ahead when he came to fill the tanks. Instead, Peters would simply enter Edwards's unlocked office, take the tanks to his truck, fill the tanks with liquid nitrogen, return the tanks, and leave a receipt on Edwards's office desk. These receipts -- printed on half sheets of green paper -- indicated that Peters had been at the farm and had filled the tanks on that day. However, Edwards testified he "never really kept up with those little green pieces of paper that [Peters] would leave" and did not regularly retain the receipts for his records. J.A. 138. After Peters had serviced the tanks, Genex's main office would generate an invoice and send it to Appellant for payment. According to Genex, the billing date and the service date should match unless the territory sales manager (here, Peters) made a mistake in entering the sale information. The invoice date, on the other hand, reflects the date that the invoice was actually generated, not the date of service.

Peters would also typically note the date of service on a hanging tag attached to a tank. Appellant noted that Peters "signed [the tag] each and every time that he c[a]me and filled the tank except [August 31, 2015] the last time that he filled it up." J.A. 330. Regardless, Appellant conceded that he did not check the hanging tag with any regularity, because there had not been any issues with nitrogen levels in the past. *See id.* at 162

8

(Appellant's deposition) ("I didn't pay a lot of attention to that tag until this happened . . . . Before that there was never an opportunity for me to see [Peters] didn't date it.").

4.

*Cancellation of the Agreements*

On July 13, 2015, Peters filled Appellant's tanks and noted the date of service on the hanging tag. Peters testified that he left a receipt, as was his custom, on Edwards's desk in the office.

On September 23, 2015, Appellant received a letter (dated September 17, 2015) from Genex, which stated that Genex would no longer be providing liquid nitrogen services in Appellant's area and thus would not be filling Appellant's tanks again. The letter expressly stated that Appellant's "tank was last serviced on 8/31/2015 to allow [Appellant] time to find a new provider." J.A. 244. The letter was accompanied by an invoice for seven filled tanks, dated August 31, 2015. Critically, however, there was no August 31 delivery. Neither the cancellation letter nor the invoice contained any indication that the last fill date was actually July 13, as opposed to August 31. Based upon this, Appellant believed that the tanks would need to be refilled in mid-October. But, Appellant did not verify the liquid nitrogen levels in the tanks.

While the Agreements provide that Genex would give 60 days' notice of termination, Genex admits that it did not provide such notice. *See* J.A. 420 (Genex's interrogatory responses) ("The failure to provide the full 60 day termination notice was an inadvertent error."). Rather, the September 17, 2015 cancellation letter expressly stated that termination of the Agreement was effective upon Appellant's receipt of the

9

letter. According to Genex, it did not give 60 days' notice of termination because it was not only ending its contract with Appellant but ceasing all liquid nitrogen services in Appellant's area.

5.

*Discovery of the Empty Tanks*

On October 12, 2015, Edwards "discovered that four of the seven tanks were completely empty and the other[s] were extremely low." J.A. 74. At that point, Edwards says he first called and left a message for Peters, which was not returned. Edwards then contacted Appellant, who also attempted, unsuccessfully, to contact Peters. Edwards then called another liquid nitrogen supplier in an effort to fill the tanks. Edwards was able to have the tanks filled shortly after. But, despite the quick refill of liquid nitrogen, four of the seven tanks suffered losses of semen and embryos.

After Appellant learned of the empty tanks, Appellant checked the hanging tag on the tank and noticed, for the first time, that Peters had not written down an August 31 fill date. Rather, the last fill date noted on the tag was July 13, 2015. According to Appellant, he did not check the tag previously because, "there was never an opportunity for [him] to see [Peters] didn't date it." J.A. 332.

Prior to October 12, the last time either Appellant or Edwards actually checked the levels of liquid nitrogen in the tanks was June or July of 2015. *See* J.A. 382 (Edwards's deposition) ("Q: And then how often between June or July and October do you monitor the tanks? A: I mean, I see them everyday as far as walking through and seeing they're there; but as far as checking the nitrogen, I wasn't checking it."). At his deposition,

10

Edwards testified that "the last time [he] was in [the tanks] . . . would have been somewhere [in] June, or first of July, something like that, was probably the last time [he] was in [the tanks]." *Id.* at 385.

On October 14, 2015, Appellant again attempted to contact Genex. Appellant wrote a letter to Genex, which informed Genex of the error and the resulting financial loss. According to Genex, it was "unsure that it received the letter." J.A. 422. Regardless, Genex did not respond to either Appellant's letter or calls.

B.

*Procedural History*

On March 24, 2016, Appellant and Edwards filed a complaint against Genex in the Eastern District of North Carolina. They raised a single claim of breach of contract, predicated on Genex's failure to timely deliver and properly invoice liquid nitrogen.

1.

*The First Motion to Amend*

On December 14, 2016, Appellant filed his first motion to amend the complaint. Specifically, Appellant sought to amend the complaint to remove Edwards as a plaintiff (leaving himself as the only plaintiff) and to add a UDTPA claim. The UDTPA claim was based upon Genex's failure to return Appellant's phone calls, invoicing of Appellant for an August 31, 2015 delivery that did not occur, and the failure to promptly invoice Appellant.

On April 13, 2017, the district court granted the motion to amend insofar as it sought to remove Edwards as a plaintiff but denied the motion insofar as it sought to add

11

a UDTPA claim. The district court concluded that such an amendment would be futile, because Appellant's amended complaint only "cites to [Genex's] irresponsible and unprofessional conduct as well as its inattention to detail," which the district court found was "simply insufficient to support the aggravating circumstances necessary to sufficiently allege a UDTP[A] claim." J.A. 47.

2.

*Deposition of Peters*

On February 16, 2017, after Appellant filed his first motion to amend but before the district court ruled on the motion, Appellant deposed Peters. Peters testified that if Appellant had tried to call him -- as Appellant alleged -- he would not have been able to respond to the call after the date of termination. Specifically, Peters stated that Genex told him "after a cancellation was sent, [he was] not allowed . . . to sell or to reach out to [Appellant] anymore." J.A. 84. Peters was notified of the cancellation of Appellant's contract on September 17, 2015, a month before Appellant discovered the empty tanks. Peters further testified that, as of July 14, 2015 (the day after Peters filled Appellant's tanks for the last time), it was Appellant's responsibility -- not Genex's -- to monitor the tanks.

3.

*The Second Motion to Amend*

On May 5, 2017, Appellant filed a second motion to amend the complaint. Appellant again sought to amend the complaint to add a UDTPA claim. In support of his motion, Appellant conceded that the district court had previously denied his very similar

12

motion to amend but Appellant believed that the denial was a result of counsel's inarticulate phrasing of the claim. Further, Appellant proffered that, since the first motion to amend was filed, Peters had been deposed and testified that Genex had instructed him not to contact Appellant after the cancellation was sent. Appellant alleged that this (in addition to the allegations Appellant raised in his first motion to amend) was immoral, unethical, and misleading. Therefore, Appellant argued, the district court should grant the motion to amend the complaint to include a UDTPA claim.

On September 7, 2017, the district court denied Appellant's second motion to amend. Specifically, the district court found that Appellant "failed to plead any substantial aggravating circumstances surrounding the alleged breach of contract to support his [UDTPA] claim" and instead relied on the same allegations of "dilatory, irresponsible, and unprofessional acts" that the district court had previously held "are simply insufficient." J.A. 107–08. The district court further noted that "while Mr. Peters'[s] deposition was taken after [Appellant's] first motion to amend was filed, it was taken three days prior to the motion to amend being submitted to the undersigned, and [Appellant] failed to notify the Court of its existence during the pendency of the motion to amend." *Id.* at 108. Regardless, the district court found that Peters's deposition testimony did "not reveal substantial aggravating factors." *Id.* Therefore, the district court again held that amendment of Appellant's complaint to add a UDTPA claim would be futile.

13

4.

*Dismissal of the Action*

a.

*Genex's Motion*

On September 8, 2017, Genex filed a motion for summary judgment. Genex presented two arguments in support of this motion. First, Genex argued there was no evidence that Genex breached its contract with Appellant, and if there was a breach, the breach was not material. Second, Genex asserted, even if the court determined that Genex had materially breached the contract, "the terms of the contract contained a limitation of damages clause associated with loss of embryos" and, therefore, Genex was entitled to partial summary judgment as to "whether [Appellant] was entitled to recover damages associated with loss of embryos." J.A. 110.

In response, Appellant asserted, first, that Genex had materially breached the Agreements by: (1) failing to deliver liquid nitrogen on August 31, 2015; and (2) failing to give 60 days' notice. Second, Appellant argued that he did not breach the contract with Genex by failing to routinely monitor the tanks because: (1) there was only an oral agreement between the parties, not a valid written contract, and thus there was no monitoring requirement; and (2) Appellant regularly monitored the tanks by visual inspection. Finally, Appellant argued that Genex should be equitably estopped from raising the argument that Appellant breached a contract by failing to routinely monitor the tanks, because Appellant had reasonably relied on Genex's misrepresentation that the tanks had been filled on August 31.

14

Appellant also asserted that there was no enforceable written contract between the parties because: (1) Appellant had not signed the Agreements; (2) Edwards lacked authority to sign the Agreements on Appellant's behalf; (3) Edwards signed the Agreements on the wrong line; (4) the limitation of damages clause was unenforceable due to ambiguity or unconscionability; and (5) Edwards is dyslexic and could not understand the Agreements.

b.

*Appellant's Motion*

On September 14, 2017, Appellant filed a motion for judgment on the pleadings or, in the alternative, for summary judgment. Appellant argued that he was entitled to judgment in his favor based upon "the allegations of [Appellant's] Complaint and the admissions of [Genex's] Answer." J.A. 264. Specifically, Appellant asserted that his complaint and Genex's answer established that: (1) "there was an agreement between the parties for the delivery of Liquid Nitrogen"; (2) "timely and adequate delivery of the Liquid Nitrogen is essential to the elite reproduction process" on which Appellant's business is based; (3) Genex last delivered liquid nitrogen on July 13, 2015, not August 31, and Genex breached the contract by failing to make such delivery on August 31; (4) Genex "sent [Appellant] a 'bill' for $210.00 for filling the tanks on August 31, 2015 when in fact there was no delivery made"; and (5) Genex erroneously told Appellant it had filled the tanks on August 31. *Id.* at 264–65.

Further, Appellant asserted that the Agreements were invalid because: (1) Edwards lacked authority to bind Appellant to a contract; (2) Edwards signed the

15

Agreements in the wrong place; (3) the "entire agreement" is "ambiguous in many respects"; and (3) the limitation of damages clause is unconscionable. J.A. 275.

In response, Genex argued judgment for Appellant was inappropriate because the valid contract between the parties -- entered into by Edwards on behalf of Appellant -- placed the responsibility on Appellant to routinely monitor the liquid nitrogen levels in his tank. Genex further argued, because Appellant failed to routinely monitor the liquid nitrogen levels in his tank, Appellant had breached the Agreements. Finally, Genex argued, even if there was no valid written contract, "there are no facts [pled] establishing the existence of a verbal contract" and, therefore, Appellant could not sustain a breach of contract claim regardless. J.A. 443.

c.

*The District Court's Order*

On January 3, 2018, the district court held a hearing on both dispositive motions. Thereafter, on February 8, 2018, the district court granted Genex's motion for summary judgment and denied Appellant's motion for judgment on the pleadings or, in the alternative, summary judgment.

As to Genex's motion for summary judgment, the district court concluded that Appellant had failed to raise a genuine issue of material fact as to whether Genex had breached the contract. Further, the district court found the written "contract terms provided that [Genex] would fill [Appellant's] storage tanks with liquid nitrogen and that [Appellant] would be responsible for monitoring the liquid nitrogen levels in the tanks to prevent loss of or damage to his stored biologic products." J.A. 512. Based upon this,

16

the district court found that Genex did not materially breach the contract by failing to deliver liquid nitrogen on August 31, by failing to give 60 days' notice, or by failing to promptly invoice for the tanks. Accordingly, the district court granted Genex's motion for summary judgment and dismissed the action.

As to Appellant's motion, the district court found Appellant's arguments as to the invalidity of the contract unavailing and held "[t]he terms of the contract between [the parties] plainly provide that the responsibility to monitor the liquid nitrogen levels in the storage tanks was solely [Appellant's]." J.A. 509. The district court further held that even if there was no valid written contract, Appellant's motion could not be granted because he "failed to plead or establish the terms of [a] verbal contract." *Id.* at 511. The district court also found that even if Appellant had successfully pled a valid oral contract, Appellant "ha[d] proffered no allegation or evidence that this contract was for a definite term, and thus the oral contract would have been terminable at will by either party." *Id.*

Appellant appeals the district court's orders denying his motion to amend and motion for judgment on the pleadings or, in the alternative, for summary judgment, as well as the district court's order granting Genex's motion for summary judgment.

II.

A.

*Motions to Amend*

Appellant first argues that the district court erred in denying his motions to amend the complaint to add a UDTPA claim. We review a district court's denial of a motion to amend for abuse of discretion. *See Wilkinson v. Montgomery*, 751 F.3d 214, 220 (4th

17

Cir. 2014). The district court has broad discretion to deny leave to amend, "so long as it does not outright refuse to grant the leave without any justifying reason." *Equal Rights Ctr. v. Niles Bolton Assocs.*, 602 F.3d 597, 603 (4th Cir. 2010) (internal quotation marks omitted). "A district court abuses its discretion by resting its decision on a clearly erroneous finding of a material fact, or by misapprehending the law with respect to underlying issues in litigation." *Scott v. Family Dollar Stores, Inc.*, 733 F.3d 105, 112 (4th Cir. 2013) (internal quotation marks omitted).

Relevant here, "[a] district court may deny a motion to amend when the amendment would be prejudicial to the opposing party, the moving party has acted in bad faith, or the amendment would be futile." *Equal Rights Ctr.*, 602 F.3d at 603. "A proposed amendment is futile when it is clearly insufficient or frivolous on its face." *Save Our Sound OBX, Inc. v. N.C. Dep't of Transp.*, 914 F.3d 213, 228 (4th Cir. 2019) (internal quotation marks omitted).

Appellant asserts the district court erred in concluding that amendment would be futile. Appellant asserts he successfully pled sufficient facts to support a UDTPA claim. We disagree.

1.

*The Unfair and Deceptive Trade Practices Act*

The UDTPA provides, in part, "Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful." N.C. Gen. Stat. § 75-1.1(a). Under North Carolina law, the elements of a UDTPA claim are: "(1) an unfair or deceptive act or practice or an unfair method of

18

competition; (2) in or affecting commerce; (3) that proximately causes actual injury to the plaintiff or to his business." *RD & J Props. v. Lauralea-Dilton Enters.*, 600 S.E.2d 492, 500 (N.C. Ct. App. 2004). To prevail on such a claim, "a plaintiff need not show fraud, bad faith, or actual deception." *Id.* at 500–01. Rather, "it is sufficient if a plaintiff shows that a defendant's acts possessed the tendency or capacity to mislead or created the likelihood of deception." *Id.* at 501.

Critically, to plead a successful UDTPA claim, a plaintiff must allege *egregious or aggravating circumstances* -- a mere mistake is, generally, insufficient. *See Phelps Staffing, LLC v. C.T. Phelps, Inc.*, 740 S.E.2d 923, 929 (N.C. Ct. App. 2013) (plaintiff had not "alleged any conduct by [defendant] that amounted to anything other than a billing error" and thus failed to establish that this conduct "amounted to egregious or aggravating circumstances"). This is the case because the UDTPA "is not intended to apply to all wrongs in a business setting." *HAJMM Co. v. House of Raeford Farms, Inc.*, 403 S.E.2d 483, 492 (N.C. 1991). "North Carolina courts are extremely hesitant to allow plaintiffs to attempt to manufacture a tort action and allege [a UDTPA claim] out of facts that are properly alleged as a breach of contract claim." *Jones v. Harrelson & Smith Contractors, LLC*, 670 S.E.2d 242, 259 (N.C. Ct. App. 2008), *aff'd by* 677 S.E.2d 453 (N.C. 2009). Accordingly, "[a] mere breach of contract, even if intentional, is not an unfair or deceptive act under [the UDTPA]." *Bob Timberlake Collection, Inc. v. Edwards*, 626 S.E.2d 315, 323 (N.C. Ct. App. 2006). Rather, to successfully plead a UDTPA claim predicated upon a breach of contract, a plaintiff "must show substantial aggravating circumstances attending the breach to recover under the Act." *Eastover*

19

*Ridge, LLC v. Metric Constructors, Inc.*, 533 S.E.2d 827, 833 (N.C. Ct. App. 2000) (internal quotation marks omitted).

2.

*Appellant's Proposed UDTPA Claim*

Appellant's allegations in support of a UDTPA claim in the proposed amended complaints were, in essence, that: (1) Genex breached the contract between the parties; (2) Genex misrepresented the fill date of the tanks; (3) Appellant relied on the misrepresentation, to his detriment; and (4) Genex instructed its employees to end communications with former customers once the contracts were terminated.

Appellant does not allege that Genex intentionally lied about the final fill date of the tanks, and the undisputed record reflects that the date listed on the cancellation notice and the final invoice were the product of an unfortunate clerical error. Appellant simply failed to allege "any conduct by [Genex] that amounted to anything other than . . . [an] error" attending the alleged breach of contract. *Phelps Staffing*, 740 S.E.2d at 929. An error alone is insufficient to "show substantial aggravating circumstances attending the breach." *Watson Elec. Constr. Co. v. Summit Cos.*, 587 S.E.2d 87, 95 (N.C. Ct. App. 2003) (internal quotation marks omitted). This conduct, without more, simply does not amount to the egregious or aggravating circumstances attending a breach of contract necessary to transform an ordinary breach of contract claim into a UDTPA claim. *See Jones*, 670 S.E.2d at 259.

Finally, while Appellant relies heavily upon the disproportionate consequences of this error in support of his motions to amend (the loss of highly valued biological

20

products), this argument is also insufficient. A successful UDTPA claim requires aggravating or egregious circumstances *accompanying* a breach of contract. It is not enough to allege aggravating or egregious *results* of a breach. If that were the case, then any contract dispute that results in serious losses could present a valid UDTPA claim, a result North Carolina courts have repeatedly rejected. *See, e.g.*, *Jones*, 670 S.E.2d at 259 ("North Carolina courts are extremely hesitant to allow plaintiffs to attempt to manufacture a tort action and allege [a] UDTP[A claim] out of facts that are properly alleged as a breach of contract claim."); *Bartolomeo v. S.B. Thomas, Inc.*, 889 F.2d 530, 535 (4th Cir. 1989) ("[A] plaintiff must show substantial aggravating circumstances *attending* the breach to recover under the [UDTPA] . . . ." (emphasis supplied)).

Accordingly, we affirm the district court's denial of Appellant's motions to amend.

B.

*Contract Claim*

1.

Appellant argues that the district court erroneously granted judgment in favor of Genex for two reasons.

First, Appellant argues that there is no valid written contract between the parties. But, if we were to determine that a valid written contract does exist, Appellant argues that (1) Genex breached the contract; (2) he satisfactorily complied with the monitoring requirement of the contract by visually monitoring the tanks; and (3) even if he did not comply with the monitoring requirement, Genex should be estopped from defensively

21

asserting as much. Second, Appellant asserts that there is a valid oral contract between the parties that Genex breached by failing to deliver liquid nitrogen on August 31.

Regardless of whether we conclude that there is a written contract, an oral contract, or no contract at all, the result is the same: Appellant has no valid claim for breach of contract.

2.

We review a district court's grant of summary judgment de novo. *See Gen. Ins. Co. of Am. v. United States Fire Ins. Co.*, 886 F.3d 346, 353 (4th Cir. 2018). We also "review de novo the district court's ruling on a motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c), and in doing so, apply the standard for a Rule 12(b)(6) motion." *W.C. & A.N. Miller Dev. Co. v. Cont'l Cas. Co.*, 814 F.3d 171, 175–76 (4th Cir. 2016).

A district court may grant summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). While we take the facts in the light most favorable to the non-moving party, "it is ultimately the nonmovant's burden to persuade us that there is indeed a dispute of material fact. [He] must provide more than a scintilla of evidence -- and not merely conclusory allegations or speculation -- upon which a jury could properly find in [his] favor." *CoreTel Va., LLC v. Verizon Va., LLC*, 752 F.3d 364, 370 (4th Cir. 2014) (citation omitted). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party." *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568 (4th Cir. 2015) (internal quotation marks omitted).

22

Under North Carolina law, "[t]he elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract." *Poor v. Hill*, 530 S.E.2d 838, 843 (N.C. Ct. App. 2000). "Courts may enter summary judgment in contract disputes because they have the power to interpret the terms of contracts." *McKinnon v. CV Indus., Inc.*, 713 S.E.2d 495, 500 (N.C. Ct. App. 2011). "Where the language of a contract is plain and unambiguous, the construction of the agreement is a matter of law; and the court . . . must construe the contract as written, in the light of the undisputed evidence as to the custom, usage, and meaning of its terms." *Hodgins v. Brighton*, 674 S.E.2d 444, 446 (N.C. Ct. App. 2009) (internal quotation marks omitted).

Appellant argues, first, that there is no written contract. Appellant argues, instead, that there is an oral contract that governs the parties' relationship.

a.

*Written Contract*

Appellant argues that no written contract exists. Alternatively, Appellant argues that if the Agreements are valid written contracts, the district court should not have granted judgment in Genex's favor, because Genex should have been equitably estopped from asserting that Appellant had breached the contract by failing to routinely monitor the liquid nitrogen levels in the tanks. We first address Appellant's equitable estoppel argument.

23

i.

*Equitable Estoppel*

Appellant argues that Genex should be estopped from asserting that he failed to monitor the liquid nitrogen levels because Appellant reasonably relied upon Genex's misrepresentation that the tanks were filled on August 31. Specifically, Appellant argues that, although he could have discovered the true fill date "by being overly diligent," he "was not required to make extensive inquiry under the circumstances." Appellant's Br. 25.

To determine whether equitable estoppel applies, the court must weigh the conduct of both parties "in the balances of equity and the party claiming the estoppel no less than the party sought to be estopped must conform to fixed standards of equity." *Hawkins v. M. & J. Fin. Corp.*, 77 S.E.2d 669, 672 (N.C. 1953). As relevant here, as to Appellant -- the party asserting estoppel -- the elements are:

> (1) lack of knowledge and the means of knowledge of the truth as to the facts in question; (2) reliance upon the conduct of the party sought to be estopped; and (3) action based thereon of such a character as to change his position prejudicially.

*Wade S. Dunbar Ins. Agency v. Barber*, 556 S.E.2d 331, 336 (N.C. Ct. App. 2001). "A party cannot rely on equitable estoppel if it was put on inquiry as to the truth and had available the means for ascertaining it." *Id.* (internal quotation marks omitted).

Here, Appellant cannot invoke equitable estoppel against Genex because Appellant cannot establish the first element of equitable estoppel -- lack of knowledge.

24

The facts clearly reflect that Appellant had "the means of knowledge of the truth as to the facts in question." *Barber*, 556 S.E.2d at 336. Indeed, Appellant conceded as much.

Specifically, Peters testified that (1) he left a receipt on Edwards's desk in the office after he filled the tanks on July 13; and (2) he noted on the hanging tag that the tank was filled on July 13. While Appellant argued during litigation that the tag would not have been reliable because Peters did not note the date of every service, at his deposition, Appellant testified that Peters signed the tag "each and every time that [Peters] c[a]me and filled the tank except [August 31]," J.A. 330, and he had simply not paid attention to the dates on the tag until he discovered the empty tanks, except on rare occasions where Peters was "running a little late from" the last refill of the tanks. *Id.* at 336.

Beyond this admission, Appellant could have learned that the tank had not been filled on August 31 by simply checking the levels of the tank as the Agreements required. Or, Appellant could have learned that the tank had not been filled on August 31 by performing what he himself referred to as "the easiest first check," J.A. 166, lifting the tanks to check the weight. Given that the tanks were to be refilled approximately every twelve weeks, the tanks would have been half of the expected weight of a freshly refilled tank on August 31. Consequently, if Appellant or Edwards had lifted the tank on or after August 31, the difference in weight would have been appreciable and would have clearly indicated that the August 31 fill date could not be accurate. Thus, Appellant certainly had "the means of knowledge of the truth as to the facts in question." *Barber*, 556 S.E.2d at 336.

25

Accordingly, like the district court, we hold that Appellant failed to establish an essential element of equitable estoppel.

ii.

*Written Contract*

We first address Appellant's argument that Genex breached the written Agreements, then address the possibility that one or more of the tanks is not covered by a valid written contract. Because we reach the same conclusion in either scenario, we need not conclusively determine the Agreements' scope and validity.

The Agreements expressly waive Genex's liability for consequential damages. They each include an "Embryo Storage Policy" providing that "Genex will not accept responsibility or liability for embryos or any other frozen biologic products." J.A. 239–42. The Agreements further provide that "Genex shall have . . . no liability for special, incidental, indirect, punitive, or consequential damages." *Id.* Finally, they place "full and sole responsibility . . . to monitor [the liquid nitrogen] level routinely" on Appellant. *Id.*

Even if Genex breached the Agreements by terminating them without 60 days' notice, or by providing Appellant inaccurate information about the most recent service date, Appellant's only claimed injury is the loss of semen and embryos -- a consequential damage that the Agreements plainly do not cover. The lost reproductive stock was a "frozen biologic product" for which Genex disclaimed liability. And, the injury could have been avoided if Appellant had performed his responsibility to regularly monitor the tank levels.

26

Appellant contends that his and Edwards's practice of visually inspecting the tanks satisfied this responsibility, but the undisputed facts establish that this is incorrect. Appellant testified that neither he nor his son routinely measured the *levels* in the tanks regularly from June to the end of September -- rather, Appellant testified that he and his son only regularly visually inspected the tanks, which, as noted above, only indicates whether the tank is defective. Such visual inspection does not reveal the level of liquid nitrogen inside the tanks. Critically, Edwards testified that when he went into the tank in October and found the tanks to be empty, that was the *first time* that he had actually opened the tanks since June or early July. *See* J.A. 148 ("I don't know when the last time I was in [the tanks was] but it would have been somewhere [in] June, or first of July, something like that, was probably the last time I was in [the tanks]."). Therefore, the levels of liquid nitrogen in the tanks went unmonitored for *at least 16 weeks* before Appellant discovered the tanks were empty.

It is clear, then, that Appellant failed to meet his contractual responsibility, and that Genex was not liable under the Agreements for the injury he claims.

b.

*Oral Contract*

Next, even if we were to assume that no valid written contract exists, and the parties' relationship was instead governed by an oral contract, Appellant's breach of contract claim still fails. Specifically, Appellant failed to adduce any evidence to establish or plead the *terms* of the oral contract, including any term relating to the length or termination of the contract. And, under North Carolina law, where there is no definite

27

end date for an oral contract, the contract is terminable at will. *See City of Gastonia v. Duke Power Co.*, 199 S.E.2d 27, 30 (N.C. Ct. App. 1973) ("[W]here no time is fixed for the termination of a contract it will continue for a reasonable time . . . and where the duration of the contract cannot be implied . . . the contract is terminable at will by either party on reasonable notice to the other.").

Thus, Genex could terminate the contract at any time so long as it provided Appellant reasonable notice. And, because Appellant does not contest the reasonableness of the notice here, the letter notifying Appellant of cancellation validly terminated the contract. *See* Oral Argument at 4:56–5:05, *Edwards v. Genex Coop., Inc.*, No. 18-1183 (4th Cir. Mar. 21, 2019), http://www.ca4.uscourts.gov/oral-argument/listen-to-oral-arguments ("We're not particularly arguing that they didn't give reasonable notice, but what we did was detrimentally rely on that notice, which was clearly in error.").

Given that the letter made termination effective upon receipt, Genex's obligations under any oral contract that may have existed ceased on September 23, 2015 -- the date Appellant received the letter -- and Genex had no obligation to fill Appellant's tanks after that date. As such, we conclude that Genex did not breach any oral contract.

Moreover, North Carolina's Uniform Commercial Code provides that a buyer may only recover consequential damages resulting from a seller's breach "which could not reasonably be prevented by cover or otherwise." N.C. Gen. Stat. § 25-2-715(2)(a). By failing to monitor the tanks, including "the easiest first check" of simply lifting them up, J.A. 166, Appellant failed to take reasonable measures to prevent the consequential damages that he now claims.

28

Because Appellant's claim fails whether an oral or written contract applies, we affirm the district court's decisions to grant Genex's motion for summary judgment and to deny Appellant's motion for judgment on the pleadings or, in the alternative, summary judgment.

III.

For these reasons, the judgment of the district court is

*AFFIRMED*.